LEAH BROWNLEE TAYLOR
Leah.B.Taylor@usdoj.gov
United States Department of Justice
Senior Trial Attorney
PO Box 7146
Washington, D.C. 20044
(202) 616-4325
Attorney for Greg T. Bretzing

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON

Ryan Payne and Victoria Sharp,
Plaintiffs.

v.

W. Joseph Astarita, individually and in
his official capacity as an agent of the
FBI, Defendants 1X through 6x,
individually and  in their official capacity
as agents of  the Oregon State Police,
Greg T. Bretzing, individually and in his
capacity as an officer of the FBI,
Defendants 7x through 12x, individually
and in their official capacity as officers of
the FBI,
Defendants.

**No. 2:18-cv-165-MO**

Defendant Greg T. Bretzing's
Motion to Dismiss Pursuant
to Fed. R. Civ. P. 12 (b)
Oral Argument Requested

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

DEFENDANT GREG BRETZING'S MOTION TO DISMISS ...................................... 1

BACKGROUND ......................................................................................................... 2

PROCEDURAL HISTORY .......................................................................................... 7

ARGUMENT .............................................................................................................. 9

   A.   The *Bivens* Cause of Action Should Not be Extended in this Case ...................... 9

      1.   Plaintiffs' Claims Against Bretzing Present a New *Bivens* Context ............... 10

      2.   Alternative Processes Exist to Protect the Interests at Stake. ........................ 11

      3.   Special Factors Counsel against Recognizing Plaintiffs' Novel *Bivens* Claims. ........... 13

   B.   Bretzing is Entitled to Qualified Immunity. ...................................................... 16

   C.   "Westfall Act" Immunity Bars State Law Liability ............................................ 23

   D.   Plaintiffs' Complaint is Time Barred, Does Not Relate Back to the Original Complaint, and Service of Process is Insufficient and Untimely. ...................... 24

   E.   Payne and Sharp Lack Standing to Sue for Equitable Relief ............................ 26

CONCLUSION .......................................................................................................... 29

# TABLE OF AUTHORITIES

Cases

*Anderson v. Creighton,*
  483 U.S. 635 (1987) ................................................................. 17

*Armstrong v. Davis,*
  275 F.3d 849 (9th Cir. 2001) ................................................... 28

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ........................................................ passim

*Baldwin Cnty. Welcome Ctr. v. Brown,*
  466 U.S. 147 (1984) ................................................................. 25

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007) ................................................................. 19

*Benny v. Pipes,*
  799 F.2d 489 (9th Cir. 1986) ................................................... 25

*Bernhardt v. County of Los Angeles,*
  279 F.3d 862 (9th Cir. 2002) ................................................... 28

*Bibeau v. Pacific Northwest Research,*
  Found'n, 188 F.3d 1105 (9th Cir. 1999) ................................. 24

*Bivens v. Six Unknown Fed. Narcotics Agents,*
  403 U.S. 388 (1971) .......................................................... 1, 10

*Bivens v. Six Unknown Named Agents of the Fed. Bur. of Narcotics,*
  409 F.2d 718 (2d Cir. 1969) ................................................... 12

*Brower v. County of Inyo,*
  884 F.2d 1316 (9th Cir. 1989) ................................................. 20

*Bush v. Lucas,*
  362 U.S. 367 (1983) ................................................................. 16

*Bush v. Lucas,*
  462 U.S. 367 (1983) ................................................................. 11

*Camretta v. Greene,*
  563 U.S. 692 (2008) ................................................................. 17

*Carlson v. Green,*
  446 U.S. 14 (1980) ..................................................... 10, 12, 23

*City of Indianapolis v. Edmond,*
  531 U.S. 32 (2000) ................................................................... 20

*City of Los Angeles v. Lyons,*
  461 U.S. 95 (1983) ............................................................ 27, 28

*Corr. Servs. Corp. v. Malesko,*
  534 U.S. 61 (2001) ................................................................... 11

*Coszalter v. City of Salem,*
  320 F.3d 968 (9th Cir. 2003) ................................................... 22

*Cunningham v. Gates,*
  229 F.3d 1271 (9th Cir. 2000) ................................................. 21

*Daniels v. Williams,*
   474 U.S. 327 (1986) ........................................................................... 21

*Daniels,*
   474 U.S. ........................................................................................... 23

*Davis v. Passman,*
   442 U.S. 228 (1979) ..................................................................... 10, 11

*Dietrich v. John Ascuaga's Nugget,*
   548 F.3d 892 (9th Cir. 2008) ............................................................ 22

*District of Columbia v. Wesby,*
   138 S. Ct. 577 (2018) ........................................................................ 17

*Dooley v. Reiss,*
   736 F.2d 1392 (9th Cir. 1984) .......................................................... 19

*Duke Energy Trading and Marketing, LLC v. Davis,*
   267 F.3d 1042 (9th Cir. 2001) .......................................................... 24

*Felarca v. Birgeneau,*
   891 F.3d 809 (9th Cir. 2018) ....................................................... 17, 18

*Graham v. Connor,*
   490 U.S. 386 (1989) ......................................................................... 19

*Gutierrez de Martinez v. Lamagno,*
   515 U.S. 417 (1995) ......................................................................... 24

*Harlow v. Fitzgerald,*
   457 U.S. 800 (1982) ......................................................................... 17

*Hernandez v. Mesa,*
   885 F.3d 811 (5th Cir. 2018) ............................................................ 15

*Jackson,*
   682 F.2d ........................................................................................... 25

*Lebron v. Rumsfeld,*
   670 F.3d 540 (4th Cir. 2012) ....................................................... 14, 15

*Marcilis v. Township of Redford,*
   693 F.3d 589 (6th Cir 2011) ....................................................... 19, 22

*Mesa v. United States,*
   123 F.3d 1435 (11th Cir. 1997) ........................................................ 14

*Meshal v. Higgenbotham,*
   804 F.3d 417 (D.C. Cir. 2015) ......................................................... 16

*Miller v. Reed,*
   176 F.3d 1202 (9th Cir. 1999) .......................................................... 21

*Milligan v. United States,*
   670 F.3d 686 (6th Cir. 2012) ............................................................ 14

*Minneci v. Pollard,*
   556 U.S.  (2012) ............................................................................... 12

*Mueller v. Auker,*
   576 F.3d 979 (9th Cir. 2009) ............................................................ 17

*Nordstrom v. Ryan,*
   762 F.3d 903 (9th Cir. 2014) ............................................................ 28

*O'Shea v. Littleton,*
   414 U.S. 488  (1974) ........................................................................ 28

*Pearson v. Callahan*,
   555 U.S. 223 (2007)...................................................................................... 17
*Reichle v. Howards*,
   566 U.S. 658 (2012)...................................................................................... 11
*Robbins v. Oklahoma*,
   519 F.3d 1242 (10th Cir. 2008) ................................................................... 19
*San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*,
   483 U.S. 522 (1987)...................................................................................... 19
*Shuler v. United States*,
   531 F.3d 930 (D.C. Cir. 2008) ..................................................................... 13
*Simon v. Hartford Life Inc.*,
   546 F.3d 661 (9th Cir. 2008) ....................................................................... 24
*Smith v. University of Washington, Law School*,
   233 F.3d 1188 (9th Cir. 2000) ..................................................................... 29
*Solida v. McKelvey*,
   820 F.3d 1090 (9th Cir. 2016) ..................................................................... 26
*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016).................................................................................. 27
*United States v. Bundy*,
   No. 3:16-CR-00051-BR, 2016 WL 5340303 (D. Or. Sept. 21, 2016)............. passim
*Vega v. United States*,
   881 F.3d 1146 (9th Cir. 2018) ..................................................................... 11
*Westfall v. Erwin*,
   484 U.S. 292 (1988)...................................................................................... 23
*Wilkie v. Robbins*,
   551 U.S. 537 (2007).................................................................................. 12, 13
*Wos v. Sheahan*,
   57 Fed. Appx. 694 (7th Cir. 2002) ............................................................... 21
*Ziglar v. Abbasi*,
   137 S. Ct. 1843 (2017).............................................................................. passim

## Statutes

18 U.S.C. §372 ................................................................................................... 6
18 U.S.C. § 2331(5)(b) (2001)...................................................................... 14, 15
18 U.S.C. § 3006A .............................................................................................. 12
18 U.S.C. §§ 1361 .............................................................................................. 14
18 U.S.C. §§ 3141-51 ......................................................................................... 12
18 USCS § 16 (2016)............................................................................................ 6
28 U.S.C. 2679(d)(1) .......................................................................................... 24
28 U.S.C. § 530C(b)(1) ....................................................................................... 15
28 U.S.C. § 2241 ................................................................................................. 12
28 U.S.C. § 2679(b) .............................................................................................. 1
28 U.S.C. § 2679(b)(1) .................................................................................. 21, 23
28 U.S.C. §§ 1346(b) .......................................................................................... 12
42 U.S.C. §1983................................................................................................... 12
42 U.S.C. § 1985(3) ............................................................................................ 18

42 U.S.C. § 1986 ........................................................................................................ 18
Or. Rev. Stat. § 12.110 .............................................................................................. 24
Pub. L. No. 100-694 .................................................................................................. 23
Pub. L. No. 105-119 .................................................................................................. 12

Rules

Fed. R. Civ. P. 4 ........................................................................................................ 25
Fed. R. Civ. P. 4(i)(3) ........................................................................................... 25, 26
Fed. R. Civ. P. 11 ...................................................................................................... 23
Fed. R. Civ. P. 12 ..................................................................................................... i, 1
Fed. R. Civ. P. 15(c)(1)(C) ....................................................................................... 25
Fed. R. Crim. P. 5.1 .................................................................................................. 12
Fed. R. Crim. P 12 .................................................................................................... 12
Fed. R. Evid. 201 ........................................................................................................ 2

Regulations

28 C.F.R. § 0.85 ....................................................................................................... 14
28 C.F.R. § 0.85(i) ................................................................................................... 14
28 C.F.R. § 15.4(a) ................................................................................................... 24

## DEFENDANT GREG T. BRETZING'S MOTION TO DISMISS

Defendant Greg T. Bretzing, moves to dismiss the Plaintiffs' complaint under Federal Rules of Civil Procedure 12 (b)(1), (5) and (6). Plaintiffs Ryan Payne and Victoria Sharp assert constitutional claims against Bretzing under the First, Fourth, and Fifth Amendments along with a number of common law claims. All their claims arise in connection with Payne and Sharp's participation in an armed civilian occupation of the Malheur Wildlife Refuge on January 26, 2016. *See* Compl. ECF No. 56. At the time Bretzing was the Special Agent in Charge of the FBI's Portland Division.[1]

As shown below, Payne and Sharp have no case and their complaint should be dismissed. They want damages under *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388 (1971), but that judge-made remedy does not extend to the context of their case, nor should it be extended under current Supreme Court precedent. Even if Payne and Sharp could sue under *Bivens*, qualified immunity bars their claims. The state law claims are barred by 28 U.S.C. § 2679(b), which forecloses personal suits against federal employees. The Plaintiffs also have not properly served Bretzing, which is grounds for dismissal under Rule 12(b)(5). And they lack standing to pursue equitable relief based on alleged past events.

Pursuant to Local Rule 7-1 (a), counsel certifies that she conferred in good faith with Plaintiffs' counsel concerning this motion, but the parties were not able to reach a resolution regarding the claims, defenses or issues that are the subject of the motion.

---

[1] *See* https://archives.fbi.gov/archives/news/pressrel/press-releases/gregory-t.-bretzing-named-special-agent-in-charge-of-portland-division.

# BACKGROUND[2]

On January 26, 2018, Shawna Cox (who is not now a Plaintiff) commenced this action by filing a pro se complaint concerning a traffic stop, roadblock, and use of force on January 26, 2016 in Oregon. *See* ECF No.1 ("Cox Complaint"). Payne and Sharp filed a "Corrected Complaint," almost identical to the Cox Complaint. They allege that on January 26, 2016, they along with Ryan Bundy, Shawna Cox, and LaVoy Finicum were traveling on US Highway 395 in a Dodge pickup truck when they were subjected to a traffic stop. *See* ECF No. 56 ("Corrected Complaint" or "Compl."). Finicum was the driver. Payne was in the front passenger seat, Ryan Bundy, Cox and Sharp were passengers in the back seats. Compl. at 6, ¶ 2. Plaintiffs describe their travel as peaceful, *see id*. at 2, but at the time of the traffic stop, they were leaving a crime scene at the Malheur National Wildlife Refuge (Refuge) in Harney County, Oregon. *See id*. at ¶ 1, *see United States v. Payne* et al*., 3:16-cr-00051, ECF Nos. 14 (Redacted Criminal Complaint or Criminal Compl.) (attached as Ex. A) and 282 ("Redacted Superseding Indictment") at 2-3 (attached as Ex. B). The Refuge, owned by the United States government, had been subject to a then on-going armed civilian takeover absurdly characterized by the perpetrators as a hostile adverse possession. *Id*.[3]

---

[2] The background and materials we have provided and referred to here are helpful to understanding the events and context from which this case arose. A motion requesting judicial notice of the referenced facts and background material under Fed. R. Evid. 201 has been separately filed in support of this motion. The legal grounds for dismissing Payne and Sharp's claims can be addressed within the four corners of their complaint, which neither states a plausible claim for relief, *see Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), nor establishes their Article III standing to seek injunctive relief.

[3] *See Cox v. United States of America*, 17-cv-00121, ECF No. 15(D. Or. 2017) (Findings and Recommendation) (attached as Ex. C); Superseding Indictment at 2-3; *United States v. Astarita*, 3:17-cr-00226-JO, ECF No. 104 ("Decision and Order") at 2 (attached as Ex. D); *see also United States v. Bundy*, No. 3:16-CR-00051-BR, 2016 WL 5340303, at *1–2 (D. Or. Sept. 21, 2016) ( "[t]he lands comprising the Malheur National Wildlife Refuge are owned by the United States

This armed occupation of federal buildings and land garnered local and national media attention. It was widely publicized through media outlets that Finicum and other occupiers, including Payne, Cox, and Bundy, were openly armed and willing to use violence against law enforcement officers to continue their occupation of the Refuge.[4] In Finicum's dramatic declaration to the world he was "[w]illing to kill and be killed if necessary" in his standoff with the law. *Id.* Payne similarly avowed his willingness to kill federal agents.[5] He was depicted at the Refuge occupation with a "visible holster on his hip." *See* Criminal Compl. at 16.

Against the backdrop of these crimes, law enforcement agents initiated a traffic stop of Payne, Sharp, Fincum, Bundy, and Cox when they left the Refuge and set out on U.S. 395 in the

---

government and include lands reserved from the public domain, lands transferred by other federal agencies, and lands acquired from private parties.") *Cox v. United States of America*, 17-cv-00121, ECF No. 15(D. Or. 2017).

[4] *See* Criminal Compl. at 5-31 (documenting social media and news accounts). It was publicly reported that others were encouraged to come to "bring [] arms" to the Refuge in support of their occupation cause. *See e.g.* https://www.youtube.com/watch?v=rMN_pHrD0ig (last visited on May 10, 2019)(ABC News, Published January 4, 2016, Statements of Ammon Bundy and LaVoy Finicum: "….Willing to kill and be killed if necessary"…"We are armed because in order to truly expresses 1st amendment rights, we need our second amendment rights"); https://www.youtube.com/watch?v=XUTOvhIgqq0_ (last visited on May 10, 2019)( (MSNBC News, Published January 6, 2016, Statement of LaVoy Finicum: "Well they are not gonna just come up to a guy with a rifle and put handcuffs on him"). At least one news source quoted Finicum stating that the occupiers "did not intend on giving [the Refuge] back to the [federal government]. *See* https: https://www.youtube.com/watch?v=N1DiMtcZXCA (last visited on May 10, 2019)(Oregonian Published January 26, 2016, Statement of LaVoy Finicum). According to one NBC news headline, Finicum's admonition also came with a specific warning to the FBI: he'd "take death over jail. *See* Ex. E (Collected News Articles); *see e.g.* https://www.nbcnews.com/news/us-news/oregon-occupier-lavoy-finicum-warns-fbi-he-d-take-death-n491056.

[5] *See* https://www.latimes.com/nation/la-na-activists-oregon-20160105-story.html (reporting Ryan Payne's statement to the Missoula Independent Weekly concerning stand-off with federal agents in Nevada over grazing rights: "'We had counter-sniper positions on their sniper positions. We had at least one guy, sometimes two guys, per BLM agent in there', Payne told the Missoula Independent weekly newspaper in Montana. 'If they made one wrong move, every single BLM agent in that camp would've died.'")

Dodge pickup on January 26. *See* Compl. at 6, ¶¶ 1-2. Brian Cavalier and Ammon Bundy, also perpetrators in the armed occupation of the Refuge, travelled behind in a Jeep. With them was an alleged FBI informant, Mark McConnell. *Id*. at 6, ¶¶ 1-4.[6] The Dodge pickup was first stopped by several unmarked law enforcement vehicles. Payne and Sharp describe that as "Stop 1." *Id*. at 6, ¶¶ 8, 9. From the unmarked vehicles, Oregon State Police ("OSP") officers, described as "Defendant Officers 2x, 4x and 5x," allegedly trained laser dots at Payne's eyes, and OSP "Defendant Officer 5x fired a round from a high-powered rifle at Payne, narrowly missing" him they say.[7] *Id*. at 4, 6, ¶¶ 10, 13-14. Payne surrendered. He exited the Dodge pickup with his hands up. He was the only occupant of the pickup to surrender at "Stop 1." *Id*. at ¶ 15. He allegedly was "detained without warrant and without charge by either OSP or FBI." *Id*. at ¶16. (Payne was in custody when his arrest warrant was issued by Magistrate Judge Beckerman). *See* Criminal Compl. at 31, ¶ 56. Payne and Sharp do not allege that Bretzing was present during Stop 1, fired any rounds, or had any involvement in Payne's detention. Compl. at 6, ¶¶ 1-16.

Finicum "waited a short while" after Payne got out before racing away with Bundy, Sharp, and Cox still in the truck. Compl. at 7, ¶¶ 17-18. They traveled northbound on Highway 395 at a "speeds up to 70 mph," while being "chase[d]" by unmarked vehicles containing Defendant Officer 2x, an OSP officer. Compl. at 7, ¶¶ 17-18; *see also* Decision and Order at 2. Their escape attempt did not last long. Payne and Sharp allege that OSP officers, "Officers 1x and 3x" had erected an "illegal roadblock on a blind curve" under an "ambush plan" put in place

---

[6] Payne and Sharp allege that Defendants "surveilled and monitored Plaintiffs' communications" before they plotted to lay and wait and ambush the Plaintiffs. Compl. at 8.

[7] Payne and Sharp identify Defendant Officer 1x-6x as officers "in the Oregon State Police." Compl. at 4.

by Bretzing and other officials, whom they call "the roadblock ambush team." Compl. at 7, ¶ 19.

According to their complaint, road spikes were placed *before* the road block and the roadblock

had parked vehicles on Highway 395 obstructing the roadway. *Id*. at 3, ¶ 8 7, ¶ 20.

Finicum "saw the obstruction and attempted to avoid a collision" but an OSP officer,

"Defendant 1x," fired multiple rounds (bullets) at the pickup causing Finicum to swerve into a

snowbank. Payne and Sharp describe this as "Stop 2." *Id*. at 7, ¶¶ 21-23. Then, they say,

"Defendant 1x fired bullets into and around the vehicle without warning." *Id*. at ¶ 24. According

to Payne and Sharp, around 4:30 pm Finicum exited with his hands in the air unarmed. *Id*. at ¶¶

25-26. But he "disregard[ed] repeated commands to stop and get down on the ground." *See*

Decision and Order at 2. Payne and Sharp say Finicum reached toward his lower torso after "a

taser charge, live round or rubber bullet" hit his torso and he was shot in the back by OSP officer

"Defendant 1x." Compl. at 7, ¶ 30-31. They also say "Defendant Officer 2x" fired more rounds

into Finicum's back. *Id*. at ¶ 32. In any event, Finicum was shot a total of three times by OSP

officers "as he appeared to reach for a weapon in a pocket of his coat, where officers

subsequently found a loaded handgun." Decision and Order at 2. He died at the scene. *See id*.

Payne and Sharp also allege that "Defendant Astarita and other Defendants" fired rounds

into and in the direction of Finicum's truck and that Bundy was shot in the shoulder. Compl. at 7,

¶ 27-28; *see also* Decision and Order at 2. The "Defendants" kept firing at the pickup, breaking

windows and poured "toxic CS, nerve or tear gas into the vehicle." Compl. at 7, ¶ 35. After a few

minutes "Defendants" stopped firing when the passengers yelled "stop" *Id*. at ¶ 36. Payne, who

surrendered at Stop 1, was not present during any of the events at the roadblock (Stop 2). The

remaining pickup truck occupants surrendered and were allegedly detained and put under arrest

at 10 pm. *Id*. at 3, ¶ 20. Sharp was then questioned and released. *Id*.

That same day, the government filed a thirty-two page criminal complaint, supported by affidavit, against Payne, Cox, Bundy, and their co-conspirators in connection with their unlawful occupation and use of force and threats at the Refuge, all in violation of 18 U.S.C. §372. *See* Redacted Compl. A warrant was issued for Payne's arrest. *United States v. Payne* et al, No. 113 (Arrest Warrant), attached as Ex. F. The criminal complaint and warrant were both signed by Magistrate Judge Stacie Beckerman. *See* Redacted Compl. at 31 and Arrest Warrant. On March 8, 2016, a federal grand jury issued an indictment, charging Payne, and a number of co-conspirators, including Bundy and Cox, with committing a number of federal crimes at the Refuge, including crimes of violence against federal officials from November 15, 2015 to January 26, 2016.[8] *See* Superseding Indictment at 2-3. As described in the superseding indictment, Payne, Bundy, and Cox "[b]randished and carried firearms on the premises of the MNWR and prevented federal officials from performing their official duties by force, threats, and intimidation." *Id*.; Criminal Compl. at 2-31.

Payne pled guilty to conspiracy to impede officers of the United States at the Refuge. He admitting the following:

> On or about November 5, 2015, and continuing through February 12, 2016, in the District of Oregon, I knowingly and willfully conspired and agreed with others to prevent by force, intimidation, and threats, officers and employees of the United States Fish and Wildlife Service or the Bureau of Land Management, agencies within the United States Department of the Interior, from discharging the duties of their office at the Malheur National Wildlife Refuge and other locations in Harney County, Oregon.

*United States v. Payne,* 3:16-cr-00051, ECF No. 906 at 6 (Guilty Plea Petition and Order) (attached as Ex. G).

---

[8] *See e.g.* 18 USCS § 16 (2016) (defining "crimes of violence"); 18 U.S.C. § 372 (impeding an officer).

Cox, Bundy, Payne, and Sharp brought this civil suit looking for damages and injunctive relief. Cox (and Bundy) dropped out, leaving Payne and Sharp as Plaintiffs. In their "Corrected Complaint" they do not allege that former Special Agent In Charge Bretzing was present at the "Stop 2" roadblock, or that he fired any rounds, discharged any gas or (other substance) at the pickup. Compl. at 6-7. They also do not allege that he was involved in anyone's alleged detention or arrest. *Id*. at 2-3, 6-7. They do not allege that Bretzing had any involvement in Payne's related prosecution. *Id*. Only two allegations purport to describe Bretzing's connection to the alleged events:

- Bretzing put an "ambush plan" in place with "other officials of the Oregon State Police and FBI" "the roadblock ambush team"

- Bretzing "unlawfully kept [sic]"

Compl. at 7, ¶¶ 19, 38.

While the complaint includes Bretzing as a defendant in Counts II-VI, those counts, and the complaint as a whole, largely concern the activities of unidentified defendants, none of whom Bretzing is meaningfully alleged to have directed, supervised, or controlled at the scene of the events giving rise to this suit. *Id*. at 6-7. (The Corrected Complaint also refers to people and entities not associated with this action, "Mr. Landau's federally protected constitutional rights," and "Denver Police Officers," for example. *Id*. at 12-13.).

The procedural history of this case is somewhat unusual. Cox filed the initial complaint, but on February 12, 2018, she moved to withdraw it. *See* ECF No. 9, ("Motion to Withdraw Complaint").[9] On July 19, 2018, Magistrate Judge Sullivan held a status conference. *See* ECF

---

[9] *See* Motion to Withdraw Complaint. On February 16, 2018, the Court construed the filing as a motion for voluntary dismissal, stating in its Minute Order: "[u]nless *Plaintiff Shawna Cox*

No. 43. Cox's motion to withdraw the complaint was granted, and Cox and Bundy were dismissed as parties. *See id*. Payne and Sharp appeared at the hearing through counsel, but they were deemed non-parties to the withdrawn Cox Complaint because they had never complied with Rule 11's signature requirements. *See id*; *see also* July 19, 2018 Hearing Transcript at 9, 12-13. Sharp had never signed the complaint. Neither did Payne. Instead he signed a paper with the notation "Summons and Complaint Harney County." *See id*.; *see also* Cox Complaint.

Magistrate Judge Sullivan's denied Payne and Sharp's motion to amend the withdrawn Cox Complaint, but they were permitted to file objections the court's rulings. *See* ECF No. 43. On October 16, 2018, the Court adopted Magistrate Judge Sullivan's rulings, the Cox Complaint was struck, Sharp and Payne's amended complaint was also struck, and they were granted leave to file a "Corrected Complaint" curing the Rule 11 deficiencies. *See* ECF No 54.

On October 26, 2018, Payne and Sharp filed their "Corrected Complaint" identifying them as Plaintiffs, and counsel appeared for them. *See* ECF Nos.  54, 56 ("Corrected Complaint").  The Court gave them ninety days, until January 24, 2019, to serve their complaint on Bretzing under Rule 4. *See* ECF No. 60. When they failed, the Court ordered them to show cause why it should not dismiss the action without prejudice. *See* ECF No. 69. On February 21, 2019, the Court found that Plaintiffs had not shown good cause for their failure to serve the corrected complaint within ninety days. *See* ECF No. 76. The court gave the Plaintiffs an additional thirty days, until March 23, 2019, to complete service of process, and file a status report on service of the Defendants. *Id*.

---

notifies the Court with a written filing within fifteen days of the Minute Order *that she does not wish to voluntarily dismiss this action, the Court will dismiss the lawsuit*." *See* ECF No. 10, February 16, 2018 Minute Order.

On March 8, 2019, Plaintiffs hand delivered a Corrected Complaint to Bretzing but failed to serve the United States as required in individual-capacity federal employee suits under Rule 4(i)(3). *See* ECF No. 83. They also failed to request an extension of time to do that.[10] *Id.*, and *see* docket generally. As of this writing, more than 140 days have passed since the Court's original December 12, 2018 order to serve the Defendants, more than a year has passed since the statute of limitations expired, and Payne and Sharp have failed to properly complete service on Bretzing despite multiple opportunities to do so. *See* ECF Nos. 60, 69, 76, docket generally.[11] They also failed to file a status report of service within thirty days of the Court's order. *See* ECF Nos. 77-84. To this day, Bretzing has never been served with original Cox Complaint, and the United States has never been served with the original Cox Complaint or Payne and Sharp's Corrected Complaint. *See* ECF Nos. 77-84; *see* Ex. H (Keith Ramsey Service Declaration).

## ARGUMENT

"To survive a motion to dismiss," under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 668 (2009) (citation and internal quotation omitted). The facts alleged here cannot meet that standard for several reasons, including that the *Bivens* remedy Payne and Sharp seek is not available as a matter of law.

### A.  The *Bivens* Cause of Action Should Not be Extended to the New Context of this Case.

---

[10] Counsel for the United States advised Payne and Sharp's counsel of the obligation to serve the United States in order to complete service on Bretzing under Rule 4(i)(3), but received no response from the Plaintiffs' counsel to that email communication.

[11] Bretzing publicly testified at the *United States v. Astarita*, 3:17-cr-00226-JO trial, but was not served with any complaint at the trial.

Payne and Sharp filed what they call a "*Bivens* Complaint." In *Bivens* the Supreme Court recognized a damages action for violations of the Fourth Amendment resulting from a warrantless search and arrest in the plaintiff's home. *See Bivens*, 403 U.S. at 397. In two later cases, the Court similarly allowed a damages action for a congressional employee's claim of discrimination and a prisoner's Eighth Amendment claim of deliberate indifference to serious medical needs. *See Davis* v. *Passman*, 442 U.S. 228 (1979); *Carlson* v. *Green*, 446 U.S. 14 (1980). But in the four decades since, the Supreme Court has repeatedly refused to again extend *Bivens*. In its most recent word on the subject it has stressed that it will "most often be Congress" that is best suited to decide whether to allow damages remedies for federal officials' constitutional violations. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017). That understanding is usually dispositive of new *Bivens* theories and it is so here.

After *Abbasi*, whether to allow a *Bivens* remedy depends on a three-step inquiry: First a court must decide "whether a case presents a new *Bivens* context" different from the three cases in which the Court allowed *Bivens* remedies. *Abbasi,* 137 S. Ct. at 1859. "[I]f the case is different in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court, then the context is new." *Id*. If a case presents a new context, a court must next consider if "there is an alternative remedial structure present" that makes judicial-forward leaning in the minting of new remedies inappropriate. *Id*. Finally, the court should consider whether there are other special factors counseling hesitation. *Id*. at 1860.

1. **Plaintiffs' Claims Against Bretzing Present a New *Bivens* Context.**

All of Plaintiffs' claims present a new context from *Bivens*, *Davis*, and *Carlson*. A context can be new because of:

> the rank of the officers involved; the constitutional right at issue; the generality or
> specificity of the official action; the extent of judicial guidance as to how an

> officer should respond to the problem or emergency to be confronted; the
> statutory or other legal mandate under which the officer was operating; the risk of
> disruptive intrusion by the Judiciary into the functioning of other branches; or the
> presence of potential special factors that previous *Bivens* cases did not consider.

*Abbasi,* 137 S. Ct. at 1860. Unlike *Bivens*, which involved a search and arrest by line-level

narcotics agents, this case is brought against a former FBI Special Agent in Charge for

superintending a law enforcement effort designed to apprehend armed felons who took over

federal land and menaced federal employees. These Plaintiffs do not allege what specifically

Bretzing did in confronting that emergency that they think violated their rights, and there is

scarce judicial guidance to suggest an answer to that question in any event. *Bivens*, *Davis*, and

*Carlson* do not address these type of claims. It is not at all like *Bivens* itself, and indeed the

Supreme Court has never allowed a *Bivens* action for First Amendment retaliation, *see Reichle v.

Howards*, 566 U.S. 658, 665 n.4 (2012), or for official action said to be "conscience shocking"

under constitutional due process. The context is new, and as in other post-*Carlson* new contexts

*Bivens* is not properly extended here.

2. **Alternative Processes Exist to Protect the Interests at Stake.**

When the Supreme Court has recognized *Bivens* damages remedy, it has done so "chiefly

because the plaintiff lacked any other remedy for the alleged constitutional deprivation." *Corr.

Servs. Corp. v. Malesko*, 534 U.S. 61, 67 (2001); *accord Davis*, 442 U.S. at 242 (holding that

persons who have "no [other] effective means" of redress "must be able to invoke the existing

jurisdiction of the courts for the protection of their justiciable constitutional rights.").

"'Alternative remedial structures' can take many forms, including administrative, statutory,

equitable, and state law remedies." *Vega v. United States*, 881 F.3d 1146, 1154 (9th Cir. 2018);

*see also Bush v. Lucas*, 462 U.S. 367, 385–388 (1983).

The federal criminal-justice system addresses unlawful detention, prosecution, or abuse of process-type claims. *See Wilkie v. Robbins*, 551 U.S. 537, 552 (2007). And through the Bail Reform Act of 1984, 28 U.S.C. § 2241, and the Federal Rules of Criminal Procedure, criminal defendants have the ability to challenge: 1) detentions through bail hearings or writ of habeas corpus; 2) the institution of proceedings; 3) probable cause determinations; 4) the merits of prosecution at the pre-trial and trial stage. *See id*,; *see* 18 U.S.C. §§ 3141-51; Fed. R. Crim. P. 5.1 (e), 18 U.S.C. § 3060 (a); Fed. R. Crim. P 12 (b)(3)(A) (pre-trial motions "alleging a defect in instituting the prosecution."). As reflected in the criminal docket of *United States v. Payne,* 3:16-cr-00051, Payne availed himself of these safeguards. Congress even designed a remedy for persons frivolously prosecuted or wrongly convicted. *See* Departments of Commerce, Justice, and State, The Judiciary, and Related Agencies Appropriations Act, 1998, Pub. L. No. 105-119, §617, 111 Stat. 2440, 2519 (1997) (codified at 18 U.S.C. § 3006A) (Hyde Amendment). Payne and Sharp can also seek remedies against those they say were directly involved in violating their rights. For example, they can sue the state officials who actually apprehended them, identified in their complaint as "State Defendants," for constitutional violations under 42 U.S.C. §1983, or even sue them for state torts. *Minneci v. Pollard*, 556 U.S. 118 (2012). *See also* Compl. at 4, 6-12.

At one time these alternative processes and remedies might not have foreclosed *Bivens* suits. For example, Webster Bivens was released from custody by a United States commissioner, *see Bivens v. Six Unknown Named Agents of the Fed. Bur. of Narcotics*, 409 F.2d 718, 720 (2d Cir. 1969), and *Carlson* held that the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b); 2671-2680 (2012) ("FTCA"), did not foreclose a *Bivens* action. *See* 446 U.S. at 19-24. But in new post-

*Abbasi* contexts the *default* is not to allow *Bivens* remedies at all. The availability of the avenues of redress mentioned above are enough to foreclose extending *Bivens* here.

**3. Special Factors Counsel against Recognizing Plaintiffs' Novel *Bivens* Claims.**

Even if existing remedies are thought not to be an adequate safeguard for the constitutional rights at stake, it does not mean courts fashion *Bivens* remedies for new contexts. The next step is to consider whether "special factors counsel hesitation." *See Wilkie v. Robbins*, 551 U.S. 537, 550, 554 (2007). If they do, extension of *Bivens* is unwarranted. And *Abbasi* points to several special factors that foreclose minting *Bivens* claims against supervisory-level officials like Bretzing here.

First, "a *Bivens* claim is brought against the individual official for his or her own acts, not the acts of others." *Abbasi*, 137 S. Ct. at 1860; *see also id*. ("*Bivens* is not designed to hold officers responsible for acts of their subordinates."). Payne and Sharp's suit looks to do just that. Nowhere do they allege any particular action by Bretzing by which he personally violated their rights. Second, even when "the action is confined to the conduct of a particular Executive Officer in a discrete instance," claims that "would call into question the formulation and implementation of a general policy" will "counsel against allowing a damages claim to proceed against the Executive Officials." *Id*. at 1860-61 (citation omitted). That is because claims like that "would necessarily require inquiry and discovery into the whole course of the discussions and deliberations that led to the policies and governmental acts being challenged," *id*. at 1860. How to confront the law enforcement emergency posed by armed militants' takeover of the wildlife refuge necessarily required deliberation and the exercise of sensitive public safety judgment. As in other contexts in which officers must decide "when best to arrest a dangerous criminal suspect," *Shuler v. United States*, 531 F.3d 930, 934 (D.C. Cir. 2008), "police must consider the

potential danger to public safety of letting the suspect go as well as the possibility that the suspect will destroy evidence or flee." *Mesa v. United States*, 123 F.3d 1435, 1437 (11th Cir. 1997). That alone should signal caution in extending *Bivens*. But still more, Congress has immunized that kind of judgment from tort liability under the Federal Tort Claims Act, *see Mesa*, 123 F.3d at 1437; *see also Milligan v. United States*, 670 F.3d 686, 694-95 (6th Cir. 2012). And that refusal to make such judgments grist for tort litigation is an especially strong signal that federal courts should not step in and create liability for such discretionary actions under a *Bivens* tort theory.

Similarly, claims that "call into question the formulation and implementation" of sensitive government policies implicate special factors counseling against creating a *Bivens* remedy. *Abbasi,* 137 S. Ct. at 1860. Since 1935 Congress has mandated the FBI as the lead agency responsible for investigating crimes against the United States, including attacks on federal personnel, government buildings or "any depredation against government property." *See* 18 U.S.C. §§ 1361, 3052. Likewise under its delegated authority in 28 C.F.R. § 0.85(i), the FBI exercises the Attorney General's lead investigative responsibility for all "federal crimes of terrorism." *Id.*[12] Congressional activity in this important area of law enforcement responsibility counsels hesitation in recognizing a *Bivens* remedy. *Cf. Lebron v. Rumsfeld,* 670 F.3d 540, 552

---

[12] *See* 28 C.F.R. § 0.85 (terrorism defined as "the unlawful use of force and violence against persons or property to intimidate or coerce a government…to further political or social objectives."). The term "domestic terrorism" was introduced in 2001 as part of the USA Patriot Act. 18 U.S.C. § 2331(5)(b) (2001); *see also* 2008 Attorney General Guidelines for Domestic FBI Operations (AGG DOM) (amended in 2015) and 2011 FBI Domestic Investigations and Operations Guide (DIOG) at 2.4.2.1 (attached as Ex. I).The alleged planning, surveillance, and monitoring of refuge occupiers falls squarely within FBI's authority to investigate acts of domestic terrorism.

(4th Cir. 2012) ("One may debate whether they were or were not the most effective counterterrorism strategy. But the forum for such debates is not [a] civil cause of action").

Payne and Sharp's claims against Bretzing arise solely out of his authority—created by Congress and delegated to the FBI by the Attorney General—to coordinate and manage law enforcement operations in response to a tense, high-stakes standoff with armed occupiers of a government facility. *See* 18 U.S.C. § 2331(5)(b); AGG DOM at 1-9, 21, 25. As already explained, that is much different from the "common and recurring" search and seizure in *Bivens*, *see Abbasi*, 137 S. Ct. at 1857, and it implicates the kind of policy judgment not normally suited to tort damages liability. Imposing *Bivens* liability for the exercise of that authority and discretion in cases like this risks hampering the FBI's ability to respond to serious crises like those at the refuge. It also risks hampering its ability to plan, coordinate, and share mission-critical leads to solving crimes involving unique public threats or domestic terrorism with its state and local partners.[13] Given the complex, unique characteristics of this case and Congress' charge to the FBI to deter and prevent major domestic threats, special factors counsel against recognition of an implied *Bivens* remedy against Bretzing in this new context. *Cf. Hernandez v. Mesa*, 885 F.3d 811, 819 (5th Cir. 2018) (no *Bivens* remedy given Congress' explicit charge to Border Patrol agents prevent "illegal entry of terrorists, terrorist weapons, persons, and contraband."); *Lebron*, 670 F.3d at 540 (special factors warranted dismissal of *Bivens* claims

---

[13] The FBI's assistance to local authorities in solving certain crimes of violence at a "place of public use" has been expressly encouraged and sanctioned by Congress. *See* 28 U.S.C. § 530C(b)(1) ("At the request of an appropriate law enforcement official of a State or political subdivision, the Attorney General may assist in the investigation of violent acts and shootings occurring in a place of public use."); *see e.g.* March 8, 2016 Deschutes County Sheriff's Press Conference Transcript available at https://sheriff.deschutes.org/March_8_press.pdf) (last visited on May 10, 2019).

brought by citizen declared an terrorist and "enemy combatant"); *Meshal v. Higgenbotham*, 804

F.3d 417, 418 (D.C. Cir. 2015) (special factors counsel against recognizing a *Bivens* "where

[FBI] agents' actions took place during a terrorism investigation *and* those actions occurred

overseas"). Here, as in other new *Bivens* contexts, the question is not "whether or not it would be

good policy" to create a new legal liability, but instead whether the courts or Congress is "in a

better position to decide whether or not the public interest would be served by creating it." *Bush*

*v. Lucas*, 362 U.S. 367, 390 (1983). Here as "most often" the answer is Congress. *Abbasi*, 137 S.

Ct. at 1857.

      *Bivens*' main purpose was to deter individual officer wrongdoing. There remain a number

of other ways to deter the type of misconduct in the FBI exercise of its law enforcement

authority in situations like the one giving rise to this case. Congress itself closely and regularly

scrutinizes federal agencies, including the FBI. It provides the FBI's budget appropriations and

reviews its programs, and selected investigations. *See* https://www.fbi.gov/about/faqs/who-

monitors-or-oversees-the-fbi. If indeed the FBI acts overzealously in responding to domestic

threats like those posed by the refuge takeover giving rise to this case, Congress itself can craft

appropriate remedies. The FBI is also subject to oversight by the Department of Justice's Office

of Inspector General. *See* https://oig.justice.gov/. That and the prospect of criminal prosecution

are additional deterrents of official abuse.

      Here, the alternate processes that can safeguard rights, the existence of special factors and

deterrence mechanisms, all show it is unnecessary for the Court to mint a new remedy for the

things Payne and Sharp describe in their complaint.

### B.  Bretzing is Entitled to Qualified Immunity.

Even when the law allows a personal damages cause of action against government officials, the qualified-immunity defense bars suit unless the official violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citation omitted). "'Clearly established' means that, at the time of the officer's conduct, the law was 'sufficiently clear' that every 'reasonable official would understand that what he is doing' is unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (citations and some internal quotation omitted). That "requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him." *Id.* at 590; *see also Anderson v. Creighton*, 483 U.S. 635, 640-41 (1987). A first step in applying this test is to decide whether an official violated any right at all, though the court has discretion to skip that and just dispose of the case at the second step when the right is not clearly established. *Pearson v. Callahan*, 555 U.S. 223, 236 (2007); *Mueller v. Auker,* 576 F.3d 979, 934 (9th Cir. 2009). Indeed a court "should think hard, and then think hard again, before turning small cases into large ones" by deciding constitutional questions when immunity inevitably bars suit. *Camretta v. Greene*, 563 U.S. 692, 707 (2008).

This is one of those "small cases" in which immunity bars suit. A fundamental principle of *Bivens* and other civil rights liability is that officers are liable only for their own actions. "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 667; *see also Felarca v. Birgeneau*, 891 F.3d 809, 820 (9th Cir. 2018). Payne and Sharp's complaint fails to do that, and Bretzing is entitled to qualified immunity for that reason alone.

The complaint's factual allegations, such as they are, have only this to say about Bretzing:

> At all relevant times, **Greg T. Bretzing** was the highest-ranking official of the FBI in Oregon, an agency of the Federal government. As such, he was the commanding officer of the FBI in Oregon and was responsible for the training, supervision, delegation of authority, and conduct. He was also responsible for enforcing U.S. laws and regulations and for ensuring that personnel obey the laws of the United States. **Bretzing** served as the final policymaker for the FBI in Oregon, and was vested with the responsibility and authority to hire, train, supervise, set and enforce policies and procedures, and to provide protection to American citizens, including the Plaintiffs. At all times **Bretzing** was acting as the agent of the FBI; and during and at all times he was acting under the color of federal law.

Compl. at pp. 4. *See id*. at p. 7, ¶¶ 19, 38. Perhaps in referring to "the chief law enforcement policy makers of the FBI" it also means to accuse him of an "unlawful plan," though that too is not at all clear. *See id*. at p.3. In any event, none of those allegations describe how Bretzing violated any federal right, let alone a clearly established one. And if the allegations are read to suppose some kind of liability for the actions of the on-scene officers described the complaint earlier, *see id*. at 2-3, they violate *Iqbal's* "no respondeat superior" rule. *See* 556 U.S. at 667. Otherwise they are conclusory and must be ignored. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. at 678 (citation omitted).

Likewise, working through the complaint's six counts, one also finds no factual allegations sufficient to make out a claim against Bretzing. The 42 U.S.C. § 1985(3) claim in Count 1 does not mention him at all, and presumably it is not against him. As drafted, it surely fails federal pleading standards even if Payne and Sharp intended it against him. *See* Compl. at p. 8. As for Count 2, purportedly under 42 U.S.C. § 1986, it's far from clear that the mention of "defendants in their official and individual capacity" or "defendants FBI" appearing there, *see id*.

at 8-9, means Bretzing. But even if it does the collective "defendants" reference is insufficient to plead *Bivens* or statutory civil rights liability. *Marcilis v. Township of Redford*, 693 F.3d 589, 596 (6th Cir 2011) (collecting cases); *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008) (same). And so their allegations of "false detainment, wrongful arrest, assault, battery, conspiracy against rights, seizure by excessive force, malicious prosecution and other wrongful acts . . . constitut[ing] abuse of process, abuse of authority, breach of police procedures" and violations of federal rights, Compl. at 8, would not state a claim even if they were not the kind of conclusory "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" that "will not do." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

Section 1986 does impose liability on those who, "having knowledge that any of the wrongs conspired to be done" and actionable under § 1985, do not "prevent or aid in preventing the commission of the same[.]" But Payne and Sharp include no allegations supporting a plausible inference that Bretzing knew of any conspiracy to violate their rights, had the power to prevent it, failed to do that, or even that such a conspiracy existed at all. *See Iqbal*, 556 U.S. at 678; *see also Dooley v. Reiss*, 736 F.2d 1392, 1396 (9th Cir. 1984).

Count 3 is for excessive force under the Fourth and Fourteenth Amendments. The Fourteenth Amendment can be put aside because Payne and Sharp acknowledge that Bretzing was "during and at all times" an FBI agent acting under color of federal, not state, law. Compl. at 4, 5. *See also San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 543 n.21 (1987). And excessive force claims brought by citizens not already in jail when seized are analyzed under the Fourth Amendment, not the Fourteenth Amendment's due process clause. *Graham v. Connor*, 490 U.S. 386, 395 (1989). But there are no well-pleaded facts here to

analyze under any amendment, at least not so far as Bretzing is concerned. He is alleged in Count 3 only to have acted in the scope of his FBI employment and under color of federal law. Compl. at 9. What acts he took (if any), the complaint once again does not say. It *does* say Bretzing "provided supervisory leadership among other things to the other LEO [meaning law enforcement officer] Defendants," and that he "acted as an agent, servant and employee of the FBI[.]. Compl. at 5. But "supervisory leadership" and the like are no grounds for *Bivens* liability. *Iqbal*, 556 U.S. at 677.

The complaint says that "**Brezting, McConnell**, and other officials of the Oregon State Police and FBI" "put in place" "an illegal roadblock on a blind curve" to stop their flight. Compl. at 7. But here again their allegations are conclusory. They make no allegation that Bretzing designed the roadblock or chose its precise location. Nor do they flesh out why it was "illegal." *Cf. City of Indianapolis v. Edmond*, 531 U.S. 32, 44 (2000) ("[T]he Fourth Amendment would almost certainly permit an appropriately tailored roadblock set up to thwart an imminent terrorist attack or to catch a dangerous criminal who is likely to flee by way of a particular route."). They do not even allege that they actually suffered injury because of the roadblock's design or location. *Compare Brower v. County of Inyo*, 884 F.2d 1316, 1317-18 (9th Cir. 1989) (fleeing motorist was killed by roadblock that allegedly included blinding lights). And if the allegations are read to suppose some kind of liability for the actions of the on-scene officers the complaint describes earlier, *see* Compl. at 2-3, they violate *Iqbal's* "no respondeat superior" rule. *See* 556 U.S. at 667. Otherwise they are conclusory and must be ignored. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. at 678 (citation omitted).

The allegation in Count 3 that "[n]one of the Defendant officers took reasonable steps to protect Plaintiffs from the objectively unreasonable and conscience shocking excessive force of other Defendant officers or from the excessive force of later responding officer's [sic] despite being in a position to do so," Compl. at 10, suffers all of the same flaws as the rest of Count 3. It refers only to defendants collectively, and at best it appears to be a conclusory stab at reciting the "failure to intervene" standard for excessive force liability. Under that standard "officers can be held liable for failing to intercede only if they had an opportunity to intercede." *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000). Officers who are not present cannot violate the intervention duty. *See id.* at 1289-90. Payne and Sharp allege no facts making out a claim in light of these principles.

Count 4 purports to be against Bretzing for "negligent" hiring, training, supervision and retaining. Compl. at 11. That is no constitutional claim at all, *see Daniels v. Williams*, 474 U.S. 327, 330-32 (1986). And the "Westfall Act" amendments to the Federal Tort Claims Act bar any personal liability under state law. *See* 28 U.S.C. § 2679(b)(1). Moving on to Count 5, it says the defendants, including Bretzing, did not take "reasonable steps to protect Plaintiffs from the objectively unreasonable and conscience shocking violations of the Plaintiffs' right to travel." Compl. at p. 12. The "right to travel" is wholly out of place here; it is subject to reasonable burdens and limitations, like traffic and other general laws. *See Miller v. Reed*, 176 F.3d 1202, 1205 (9th Cir. 1999). So by no stretch does the Constitution grant a right to travel free from justified police stops or arrests. *See Wos v. Sheahan*, 57 Fed. Appx. 694, 697 (7th Cir. 2002). But here too Payne and Sharp's allegations are conclusory, as is all the rest of the language under the Count 4 heading. *See id*. Like the excessive force count (and all of the complaint, really) the

"right to travel" count makes no concrete factual allegations that could support an inference that Bretzing did anything wrong. It states no viable claim.

That's also true for Count 6, which claims to be for the defendants' retaliation for Payne's and Sharp's exercise of First Amendment right to free speech, and the unnumbered "count" on page 14 referring in passing to the rights of free assembly and to petition for redress of grievances; the allegations are entirely conclusory. *See* Compl. at 12-13. Once more Payne and Sharp rely on improper collective "defendants" pleading, and once more that alone is grounds for dismissal. *See Marcilis*, 693 F.3d at 596. Like the right to travel, the First Amendment is out of place here. A genuine First Amendment retaliation claim would have to plead at least two elements: (1) "defendants took action that would chill or silence a person of ordinary firmness from future First Amendment activities;" and (2) "defendants' desire to cause the chilling effect was a but-for cause of [d]efendants' action," *Dietrich v. John Ascuaga's Nugget*, 548 F.3d 892, 900–901 (9th Cir. 2008). And actually a third element comes into play once it is recalled that a plaintiff also must have engaged in protected speech or other activity. *See, e.g., Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003). Payne and Sharp plead none of the things needed to make out a claim under these standards. Nor could they; even with concrete factual allegations. Inferences of retaliatory intent and causation will not be possible in the face of the overwhelmingly obvious "more likely explanation[ ]" for what happened: federal and state officers arrested them for an armed takeover of federal property and not for any constitutionally-protected speech or assembly. *See Iqbal*, 556 U.S. at 681. The want for proper allegations is enough to dismiss, but the principles just mentioned, and the monetary sanctions against counsel and parties for factually and legally frivolous federal pleading, will be worth

bearing in mind should Payne and Sharp consider amending their complaint. *See* Fed. R. Civ. P. 11.

None of the complaint's six counts plead a clearly-established constitutional or statutory violation by Bretzing. He cannot be vicariously liable for others' conduct; Payne and Sharp have not pleaded any actual things he did, and none of what they do describe can reasonably be conceived to have violated a federal right clearly established in the circumstances. Bretzing is entitled to qualified immunity and dismissal of the complaint.

### C. "Westfall Act" Immunity Bars State Law Liability.

As mentioned above, the Corrected Complaint's Count 4 claims to be for "negligent hiring[,] training, supervising, and retaining" (presumably of FBI employees involved in Payne and Sharp's apprehension). Compl. at 11 (all-capitalization omitted). And as also mentioned above, official negligence in doing those things violates no constitutional right. *See Daniels*, 474 U.S. at 330-32. Read generously, Count 4 is if anything a state law tort claim. The same is true for the complaint's mention of "battery" and "assault" purportedly "under the Federal Tort Claims Act." *Id*. at 14 (all-capitalization omitted).

But the Federal Tort Claims Act does not authorize state tort suits against federal employees; it *bars* them. *See* 28 U.S.C. § 2679(b)(1). That was the purpose of the so-called "Westfall Act" amendments to the FTCA; it gives the complete immunity from state tort claims the Supreme Court declined to give in *Westfall v. Erwin*, 484 U.S. 292 (1988). *See* Federal Employees Liability Reform and Tort Compensation Act of 1988, Pub. L. No. 100-694, § 2(b), 102 Stat. 4563, 4564 (Nov. 18, 1988). After the Westfall Act, the FTCA is the exclusive remedy for federal employees' state law torts, *see* 28 U.S.C. § 2679(b)(1). And "[u]pon certification" of scope of employment by the Attorney General, "the employee is dismissed from the action and

the United States is substituted as defendant." *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 420 (1995); *see also* 28 U.S.C. 2679(d)(1).

The Attorney General's delegate has issued the required "scope of employment" certification under 28 C.F.R. § 15.4(a), and that certification has been filed along with this motion. *See* Ex. J (Scope Certification). And so any state law claims against Bretzing should also be dismissed.

### D. Plaintiffs' Complaint is Time Barred, Does Not Relate Back to the Original Complaint, and Service of Process is Insufficient and Untimely.

Along with the substantive grounds for dismissal covered above go several others relating to timeliness and service of process warranting dismissal under Rule 12(b)(5) and (6). First, Payne and Sharp's suit is time-barred because it does not relate back to Shawna Cox's filing initiating this case. Acting pro se, Cox started this case by filing her complaint on January 26, 2018. That was two years to the day from the date of the events that are the subject of the suit (January 26, 2016). Cox's complaint was filed, then, on the last possible day before the two-year statute of limitations expired (assuming the application to *Bivens* actions of Oregon's personal-injury statute of limitations). Or. Rev. Stat. § 12.110, *see Bibeau v. Pacific Northwest Research Found'n*, 188 F.3d 1105, 1108 (9th Cir. 1999), *amended*, 208 F.3d 831 (9th Cir. 2000).

But Cox withdrew her complaint on February 12, 2018 and dropped out of the case. That was essentially a voluntary dismissal under Rule 41(a)(1) and its effect was "to leave the parties as though no action had been brought." *Duke Energy Trading and Marketing, LLC v. Davis*, 267 F.3d 1042, 1049 (9th Cir. 2001). That's important because a non-lawyer pro se litigant like Cox did not represent Payne and Sharp, and could not sign a pleading on their behalf. *See Simon v. Hartford Life Inc.*, 546 F.3d 661, 665 (9th Cir. 2008). So they had no case on file on the two-year statute of limitations expired. And once Cox dismissed her complaint, nothing was left for Payne

and Sharp's later-filed "Corrected Complaint" to relate back to under Rule 15(c). So their "Corrected Complaint," filed after the statute of limitations had run, is time barred.[14]

Next, dismissal based on insufficient and untimely service of process is also warranted. "A federal court is without personal jurisdiction over a defendant unless the defendant has been served in accordance with Fed. R. Civ. P. 4." *Benny v. Pipes*, 799 F.2d 489, 492 (9th Cir. 1986). The Supreme Court has cautioned that "[p]rocedural requirements established by Congress for gaining access to the federal courts are not to be disregarded...." *Baldwin Cnty. Welcome Ctr. v. Brown,* 466 U.S. 147, 152 (1984). Payne and Sharp sue Bretzing, a former federal employee, in his individual capacity. That requires serving him under Rule 4(e), (f), or (g) (or obtaining a waiver under Rule 4(d)), and also serving the United States as well. *See* Fed. R. Civ. P. 4(i)(3). Service on the United States requires service on the Attorney General and the United States Attorney for the District of Oregon. *Id*. That's true even in cases against former federal employees like Bretzing. *See* Advisory Committee Note, 2000 Amendments to Fed. R. Civ. P. 4(i)(3). And actual notice of the lawsuit will not provide personal jurisdiction without substantial compliance with Rule 4. *Jackson*, 682 F.2d at 1347.

Payne and Sharp, though now represented by counsel, failed to perfect service and repeatedly disregarded the service rules and the Court's orders regarding service in this case. Under Rule 4(m), they had 90 days from filing their Corrected Complaint, until January 24,

---

[14] For relation back Rule 15(c) requires service of the original complaint within a ninety-day time period prescribed by Rule 4(m) to relate back. Fed. R. Civ. P. 15(c)(1)(C). The Cox complaint was never served and Payne and Sharp's Corrected Complaint was not served on Bretzing within the ninety-day time period provided by Rule 4 (m) and as required under Rule 15(c). Unsurprisingly, Magistrate Judge Sullivan expressed skepticism that the Corrected Complaint related back to Cox's withdrawn complaint. *See* July 19, 2018 Hearing Transcript at 9, 12-13 ("I'm not sure if it relates back to the original complaint, which has been withdrawn.").

2019, to serve Bretzing under Rule 4. *See* ECF Nos. 54, 56, 60. The Court extended that time period until to March 21, 2019 and *twice* warned Payne and Sharp of the consequences of dismissal without prejudice. *See* ECF Nos. 69, 76 ("failure to serve the corrected Complaint in the extended time may result in an order dismissing this matter without prejudice."). Now more than 160 days have passed since the Court's October 26, 2018, order to serve the Defendants and more than 45 days have passed since the Court's March 21, 2019 *extended* the deadline. Yet Payne and Sharp still have not served the United States, as required under Rule 4(i)(3) to complete service on Bretzing. *See* Keith Ramsey Service Declaration.

Failing to serve the United States as well as the employee ordinarily might not be grounds for dismissal. *See* Advisory Committee Note, 2000 Amendment to Fed. R. Civ. P. 4(i)(3). But the Court already has allowed the "reasonable time" to cure the failure allowed in Rule 4(i)(4), and Payne and Sharp have still not complied with the service rules. So dismissal is warranted on this ground as well.

### E. Payne and Sharp Lack Standing to Sue for Equitable Relief.

In their prayer for relief Payne and Sharp also seek injunctive relief. Essentially they say they want injunctive relief "requiring defendants to correct all past violations of federal and state law as alleged" in their complaint; and "to enjoin defendants from continuing to violate federal and state law;" and "to prevent any future violations of said federal and state laws[.]" Compl. at p.15. But equitable relief is not available from Bretzing in his individual capacity. *See Solida v. McKelvey*, 820 F.3d 1090, 1094-95 (9th Cir. 2016). And he no longer works for the FBI, so he cannot be sued (or implement a court decree) in an official capacity. In any event, Payne and Sharp lack standing to sue for any injunctive relief at all. Dismissal under Rule 12(b)(1) is warranted.

"Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). It "ensure[s] that federal courts do not exceed their authority" under Article III of the Constitution, and in consequence it "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Id.* (citations omitted). Those limits come into play here. Payne and Sharp's "standing to seek the injunction requested depend[s] on whether [they] [are] likely to suffer future injury from" the kinds of official actions they complain about. *City of Los Angeles v. Lyons*, 461 U.S. 95, 106 (1983). They are not, and *Lyons* shows why.

The plaintiff in *Lyons* claimed he was subjected to excessive force during an arrest because the Los Angeles Police Department allowed its officers to use chokeholds to make arrests even when deadly force was unneeded. *Id.* at 97-98. After settling his damages claim he pressed on and sought injunctive relief to bar police chokeholds. *Id.* at 99. Reversing the Ninth Circuit's contrary ruling the Supreme Court held that Lyons lacked standing to pursue injunctive relief. His "standing to seek the injunction requested depended on whether he was likely to suffer future injury from the use of chokeholds by police officers." *Id.* at 105. Past injury was irrelevant. It did "nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part." *Id.* Likewise, his allegation that the Los Angeles police "routinely apply chokeholds in situations where they are not threatened by the use of deadly force [fell] far short of the allegations that would be necessary to establish a case or controversy between" him and the City. *Id.*

When injunctive relief is sought "case or controversy considerations 'obviously shade into those determining whether the complaint states a sound basis for equitable relief.'" *Lyons*,

461 U.S. at 103 (quoting *O'Shea v. Littleton*, 414 U.S. 488 499 (1974)). And so an essential consideration for standing to seek injunctive relief is "the likelihood of substantial and immediate irreparable injury, and the inadequacy of remedies at law." *O'Shea*, 414 U.S. at 502 (quoting with approval in *Lyons*, 461 U.S. at 103). Conjecture that the plaintiff will suffer injury again in the future does not meet this demanding standard. *See id*. The *Lyons* plaintiff could not show a likelihood of substantial and immediate irreparable injury because his theory of injury was too conjectural:

> [T]o establish an actual controversy in this case, Lyons would have had not only to allege that he would have another encounter with the police but also to make the incredible assertion either, (1) that all police officers in Los Angeles always choke any citizen with whom they happen to have an encounter, whether for the purpose of arrest, issuing a citation or for questioning or, (2) that the City ordered or authorized police officers to act in such manner.

*Id*. at 105-06. The bottom line is "[a] plaintiff seeking prospective injunctive relief 'must demonstrate that he is realistically threatened by a repetition of [the violation].'" *Nordstrom v. Ryan*, 762 F.3d 903, 911 (9th Cir. 2014) (quoting *Armstrong v. Davis*, 275 F.3d 849, 860-61 (9th Cir. 2001) (quoting in turn *Lyons*, 461 U.S. at 109 (some alterations original; some internal quotations omitted).

To say that Payne and Sharp's injunctive plea is conjectural here would be an understatement in the least. The notion that one might take over federal property again in the future, threaten federal employees, flee a traffic stop calculated at one's apprehension, and then be subjected to (what Payne and Sharp say is) excessive force is far too fanciful to confer Article III standing to enjoin the hypothesized government response. Nor does the plea for injunctive relief regarding past events save their case. "Where the activities sought to be enjoined already have occurred, and the appellate courts cannot undo what has already been done, the action is moot, and must be dismissed." *Bernhardt v. County of Los Angeles*, 279 F.3d 862, 871 (9th Cir.

2002); *see also Smith v. University of Washington, Law School*, 233 F.3d 1188, 1193 (9th Cir.

2000) ("As has sometimes been said: Mootness is the doctrine of standing set in a time frame")

(citation and internal quotations omitted).

## CONCLUSION

For the foregoing reasons Bretzing's motion to dismiss should be granted.

Respectfully submitted,

JOSEPH HUNT
Assistant Attorney General
Civil Division

C. SALVATORE D'ALESSIO, JR.
Acting Director, Constitutional Tort Staff
Torts Branch, Civil Division

RICHARD MONTAGUE
Senior Trial Counsel
Constitutional Tort Staff
Torts Branch, Civil Division

/s/ Leah Brownlee Taylor
LEAH BROWNLEE TAYLOR
United States Department of Justice
Senior Trial Attorney
Constitutional Tort Staff
Torts Branch, Civil Division
PO Box 7146
Washington, D.C. 20044
Leah.B.Taylor@usdoj.gov

Attorney for Defendants
United States of America and Greg Bretzing

## CERTIFICATE OF SERVICE

I hereby certify that on May 10, 2019, I filed the foregoing notice through the CM/ECF

system, causing the following individuals to be served by electronic means, as reflected in the

Notice of Electronic Filing:

**Roger I. Roots, Esq.**
rogerroots@msn.com
ROOTS LAW
270 Bellevue Ave. #1016
Newport, RI 02840

**James L. Buchal, Esq.**
Murphy & Buchal LLP
3425 SE Yamhill Street, Suite 100
Portland, OR 97214
P:(503)227-1011

**James S. Smith**
Department of Justice
Trial Division
100 SW Market St
Portland, OR 97201
james.s.smith@doj.state.or.us

**Thomas F. Armosino**
Frohnmayer Deatherage, et al.
2592 E. Barnett Road
Medford, OR 97501
Email: armosino@fdfirm.com

**Molly R. Silver**
Frohnmayer Deatherage, et al.
2592 E. Barnett Road
Medford, OR 97501
Email: silver@fdfirm.com

s/ Leah Brownlee Taylor
Leah Brownlee Taylor